[No. 1722-1.    Division One.    January 20, 1975.]

CHARLES J. GREEN, *Respondent*, v. ROCKET RESEARCH CORPORATION, *Appellant*.

*Jones, Grey, Bayley & Olsen, Hugo E. Oswald, Jr.*, and *George W. Steers*, for appellant.

*Shidler, McBroom, Gates & Baldwin, James R. Irwin*, and *F. Ross Boundy*, for respondent.

WILLIAMS, J.—Charles J. Green brought this action against Rocket Research Corporation to recover judgment for money said to be due for use of his patented invention, and to have certain contracts between the parties rescinded. The court, sitting without a jury, awarded Green judgment of $27,500 and denied other relief. Rocket appeals, and Green cross-appeals.

Rocket Research Corporation is engaged in the invention, development, manufacture and sale of sophisticated apparatus, some of which is used in the aerospace industry. Rocket employed Green as an inventor. The employment contract, which was in writing, required that Green assign the patent rights of his inventions to Rocket. Green was to receive a salary, and for each invention assigned upon which an application for a patent was filed he was to be paid a modest sum and

> [a] percentage of any monies actually received by RRC in payment for the assignment or license of such invention to others, except where such invention is assigned or licensed to a RRC subsidiary, or is assigned or licensed to a third party incidental to an agreement relating to the further development or manufacture by the third party of a major product or system developed by RRC. This percentage is to be 20% of the first $50,000 received on a cumulative basis, 15% of the next $50,000, and 10% of any amount received above $100,000.

During the period of his employment, Green was given the task of inventing a machine to rapidly inflate escape slides required for large passenger aircraft. He did so by inventing a cool gas inflation device, which he covered by

two basic patents and a patent application. As required by the contract, Green assigned his patent rights to Rocket.

The first opportunity to sell the machine came when the Boeing Company invited proposals for escape slides for its model 747. Four manufacturing companies, one of which was the Garrett Corporation, asked Rocket for information about Green's machine for incorporation in their escape systems. Rocket supplied each company with the necessary data, including trade secrets and confidential information about the machine not appearing in the patents. Later, Boeing requested separate bids on the slide and inflation systems. Both Rocket and Garrett bid on this request, with the award going to Garrett. Rocket, contending that Garrett's inflation device was remarkably similar to Green's machine, sued Garrett for $5 million for unfair competition and patent infringement. It subsequently developed that Garrett's inflation system was unsatisfactory, and Boeing again called for proposals. This time, Rocket was awarded the contract.

Rocket and Garrett then entered into a written contract. In the first nine paragraphs of this contract, Rocket agreed to furnish Garrett with information about Green's machine which was necessary for it to proceed with competitive negotiations then pending with Lockheed Aircraft Corporation for the supply of escape slide systems. In turn, Garrett agreed to purchase all of its needs for the cool gas inflation system from Rocket if it was awarded the Lockheed contract. Rocket agreed not to prosecute the $5 million suit against Garrett if Garrett abstained from infringing upon the patents on Green's machine.

Paragraph 10 of the agreement is as follows:

The foregoing paragraphs 1 through 9 shall become effective immediately upon the signing of this Agreement and shall continue in effect for the periods of time above mentioned irrespective of whether or not the entire suit is settled as described below. In addition, in the event that the pending Lockheed L-1011 contract is awarded to a bidder who has included ROCKET as the supplier of the

inflation system as defined in paragraph 3, the parties agree to settle the entire controversy and terminate the litigation in accordance with the following paragraphs 11 through 16.

Paragraph 11 stated, in part, that:

One of ROCKET's claims in the pending litigation is that the value of its proprietary information relating to cool gas generators was materially impaired by wrongful acts of GARRETT. Therefore, in order to make restitution to ROCKET on account of such claim and as a material part of the consideration for termination of the litigation, and the disclosures heretofore mentioned in connection with the L-1011 pending contract, GARRETT agrees to use its best efforts to promote the ROCKET cool gas inflation system in all contract proposals on which GARRETT elects to bid and where a cool gas generator inflation system is appropriate.

Other pertinent paragraphs are as follows:

12. ROCKET shall exercise its best efforts to become the supplier of the inflation system for the McDonnell-Douglas DC-10 contract for escape systems and to that end shall, subject to all of the provisions of paragraph 4 through 6 and 8 hereof, furnish GARRETT with such information concerning ROCKET's inflation system as is reasonably required by GARRETT to enable it to include such inflation system in its proposal to McDonnell-Douglas.

13. If ROCKET shall have exercised its best efforts as set forth in paragraph 12 above and despite this fact is not included as the supplier of the inflation system in said DC-10 contract when it is awarded then, and in that event, GARRETT shall pay to ROCKET the sum of $200,000.00 as a material part of the consideration for this Agreement.

14. If ROCKET shall have exercised its best efforts as set forth in paragraph 12 above and despite this fact GARRETT's proposal is not accepted but ROCKET is included as the supplier of the inflation system, then and in that event, GARRETT shall pay to ROCKET the sum of $100,000 as a material part of the consideration for this Agreement.

15. Upon a determination one way or the other of the Douglas DC-10 contract referred to in paragraphs 12 through 14 and the payment, if any therein, required

upon such determination, the parties agree to stipulate to entry of a judgment without findings or conclusions but providing for an injunction in favor of Plaintiff against Defendant's infringing Plaintiff's patent in suit for a period of two and one-half years from the date of this Agreement and otherwise dismissing the action and all claims therein.

After the agreement was signed, Garrett was awarded the Lockheed contract, and subcontracted with Rocket for it to supply the inflation system. An award from Douglas which was anticipated in paragraphs 12, 13 and 14 did not materialize. Garrett paid Rocket $200,000, and the parties stipulated that a judgment of dismissal of Rocket's suit against Garrett be entered.

Green then brought this action against Rocket contending that Rocket had licensed his invention to Garrett, that Rocket had received $200,000 therefor, and that he, Green, was entitled to $27,500 as his percentage share. Rocket took the position that the $200,000 was paid for settlement of its lawsuit against Garrett and not as royalty for giving Garrett a license to use Green's invention. In its findings, the court determined that Rocket had licensed Green's invention to Garrett and that

[t]he principal motivation by Garrett in entering into the Agreement was to obtain the right to bid and market the Rocket Mark X cool gas generator . . . The payment of the sum of $200,000 by Garrett to Rocket was for the right to bid and market the Mark X cool gas generator and inflation system as part of Garrett's evacuation slide where Garrett elected to propose its evacuation slides to airframe manufacturers and airlines.

Finding of fact No. 21.

The patents on Green's invention gave Rocket the right to exclude everyone from its manufacture, use, or sale because of 35 U.S.C. *Patents* § 154 (1970), which provides:

Every patent shall . . . grant to the patentee, his heirs or assigns, . . . the right to exclude others from making, using, or selling the invention throughout the United States, . . .

■ Prior to the agreement between Rocket and Garrett, Garrett did not have the right to make, use, or sell the invention, and Rocket did have the right, through legal process, to prevent Garrett from doing so. Rocket, as assignee of the patentee of the invention, could grant separately the right to make, the right to sell, and the right to use the invention (60 Am. Jur. 2d *Patents* § 331, at 509 (1972)), and was the sole judge as to what party or parties would be given any one or all of those rights. *Extractol Process v. Hiram Walker & Sons, Inc.*, 153 F.2d 264 (7th Cir. 1946).

■ The agreement between Rocket and Garrett granted Garrett the right to use Green's invention in the manufacture of its escape system and the right to sell it as an integral part of that system. Rocket retained the right to manufacture the device and, also, the right to permit others to manufacture, use, or sell it. The grant to Garrett of the right to use and sell the device was, therefore, a license. *Talbot v. Quaker-State Oil Refining Co.*, 104 F.2d 967 (3d Cir. 1939); *General Motors Corp. v. Dailey*, 93 F.2d 938 (6th Cir. 1937); *George Close Co. v. Ideal Wrapping Mach. Co.*, 29 F.2d 533 (1st Cir. 1928); *Lukens Steel Co. v. American Locomotive Co.*, 99 F. Supp. 442 (N.D.N.Y.), aff'd, 197 F.2d 939 (2d Cir. 1952). *See also Thys Co. v. Brulotte*, 62 Wn.2d 284, 382 P.2d 271 (1963).

There is substantial evidence in the record to support the court's finding that the overall purpose of the agreement, in addition to possibly settling the lawsuit, was to promote the manufacture and sale of Rocket's gas inflation device and that Garrett paid $200,000 for a license to use and market it.

Rocket contends that it had the sole right to determine the character of the $200,000 payment because of the following paragraph appearing in the employment contract:

RRC shall have the right to determine in its sole and absolute discretion whether a price or royalty will be charged for an assignment or license of such invention to others, the amount of any such charge, whether any

charge for such assignment or license previously granted will be waived, and whether a portion of any amount received in payment for the assignment or license also constitutes payment for other inventions, proprietary rights or information, or assistance.

This paragraph gives Rocket the right to determine the amount which will be charged for an invention and to apportion the amount received to other inventions, proprietary rights or information, and assistance. As seen, Rocket decided that Garrett should pay $200,000 for certain rights in Green's invention. There is no evidence that Rocket apportioned any of that sum to pay for any other invention, proprietary right or information, or assistance. It was Green's invention and he should be paid for it as provided in the employment contract.

Green's cross-appeal challenges the trial court's determination that the assignments of the patents from Green to Rocket should not be rescinded. He contends that the contract between Rocket and Garrett was in violation of antitrust laws, in that it resulted in a restraint of trade, the division of markets among competitors, and was an illegal tying arrangement. He also contends that there was a "patent misuse" of his invention. In support of these contentions, Green states in his brief:

> The agreement between Rocket and Garrett is a blatant example of a combination between competitors in restraint of trade. The main purpose of the agreement was to join forces to attempt to capture the slide inflation market and an important by-product was the elimination of AiResearch as a competitor of Rocket Research.

The record does not support these contentions. There is nothing in the contract which ties Rocket and Garrett into any kind of an exclusive arrangement. Rocket was free to enter into similar contracts with other suppliers, and would undoubtedly do so if there was a reasonable expectation of profit. It appears that there were at least three other escape slide manufacturers with whom Rocket was cooperating, and there is nothing in the record to suggest that Rocket

would refuse to deal with a manufacturer who wished to incorporate Green's invention in its slide escape system.

■    Green also contends that he should be allowed prejudgment interest. Prejudgment interest is properly awarded from the date a claim becomes liquidated.

> "A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate.

*Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 170, 273 P.2d 652 (1954); *Beedle v. General Inv. Co.*, 2 Wn. App. 594, 469 P.2d 233 (1970). It was established that Rocket received $200,000 for the license of Green's invention. The amount due Green can be computed with exactness, without reliance upon opinion or discretion. The amount owing was therefore liquidated and interest should be paid.

The judgment of the trial court is affirmed on the appeal, and modified on the cross-appeal by the addition of an award of interest at the statutory rate from the date of the payment of $200,000 by Garrett to Rocket.

SWANSON, C.J., and CALLOW, J., concur.

Petition for rehearing denied May 8, 1975.

Review denied by Supreme Court June 24, 1975.